# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

CLINCH RIVER CAPITAL
PARTNERS, INC.,

      Plaintiff,

v.

ELSEA, INC.,

      Defendant.

Case No. 2:11-CV-00400
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth P. Deavers

## OPINION AND ORDER

Plaintiff Clinch River Capital Partners, Inc., brings this diversity action against Defendant Elsea, Inc., asserting claims of breach of contract and unjust enrichment. This matter is before the Court for consideration of Plaintiff's Motion for Summary Judgment. (ECF No. 44.) For the reasons that follow, Plaintiff's Motion is **DENIED**.

## I. Background

Defendant is an Ohio corporation in the business of selling and financing the purchase of homes. Plaintiff is a Georgia corporation that obtains financing for its clients as part of its business.

In March 2009, the parties entered into a non-exclusive engagement letter for Plaintiff to "arrange senior debt financing" for Defendant. (Compl Ex. A at 1, ECF No. 5-1.) Defendant agreed to pay Plaintiff a minimum fee upon the execution of the letter. (*Id.*) Defendant also agreed to pay Plaintiff a success fee if Plaintiff was able to identify and introduce Defendant to a

participant willing to provide financing.[1] (*Id.*) The engagement letter also stated that Defendant would reimburse Plaintiff for out of pocket disbursements including long distance phone calls and reasonable travel expenses. (*Id.*)

Under the March 2009 agreement, Plaintiff assisted Defendant in obtaining financing from Century Capital/Century Services, Inc. ("Century Services"). On September 18, 2009, Century Services and Defendant entered into a Term Loan and Security Agreement in which Century Services agreed to provide a loan of $5,000,000 for a one-year period. (*See* Mot. Summ. J. Ex. C, ECF No. 44-3; Compl. ¶¶ 8–9, ECF No. 2.) The Term Loan and Security Agreement between Defendant and Century Services allowed for the possibility of an extension, stating, "[p]rovided that no Event of Default exists as of the last Business Day of the initial Term, or any renewal Term, [Century Services], in its sole discretion will consider extending the Term for a period of up to twelve (12) months . . . ." (Mot. Summ. J. Ex. C Sec. 13.1, ECF No. 44-3.) After agreeing to this loan with Century Services, Defendant paid Plaintiff the success fee under the March 2009 agreement. (Elsea Dep. 28, ECF No. 43-1.[2])

Defendant and Plaintiff entered into another non-exclusive financing agreement, through a second engagement letter, in January 2010.[3] (Mot. Summ. J. Ex. B at 1, ECF No. 44-2.) The terms of the second agreement are highly similar to the March 2009 agreement. Specifically,

---

[1] Under the terms of the agreement, Plaintiff was only entitled to this success fee if Defendant ultimately concluded financing with the third party. (Compl Ex. A at 1, ECF No. 5-1.)

[2] For the purposes of this Opinion and Order, "Elsea Dep." will refer to the deposition of Asa Elsea as opposed to Jay Elsea.

[3] Defendant was represented by counsel when it entered into this agreement. (Elsea Dep. 88, ECF No. 43-2.)

under the January 2010 agreement, Plaintiff had the task of "arranging senior debt financing" for Defendant. (*Id.*) The agreement detailed that Plaintiff "would manage the transaction process and arrange the financing with one or more qualified institutional investors." (*Id.*) As in the first engagement letter, the January 2010 agreement entitled Plaintiff to a minimum fee upon execution of the engagement letter. (*Id.*) Once again, the agreement stated that Plaintiff would receive a success fee if Defendant "concluded a financing . . . with a participant that [Plaintiff] has identified and introduced." (*Id.*) The January 2010 agreement also stated that Plaintiff would "be reimbursed for out of pocket disbursements and costs incurred, not to exceed $10,000." (*Id.*)

The January 2010 agreement incorporated both an attachment sheet and a preliminary term sheet.[4] (Mot. Summ. J. Ex. B at 3–4, ECF No. 44-2.) The attachment sheet clarified that Plaintiff would earn the success fee "upon closing of the investment by an investor introduced to [Defendant] by [Plaintiff]." (*Id.* at 3.) With regard to expenses, the attachment sheet contained a provision stating:

> Expenses: [Plaintiff] will send invoices weekly, which are due upon receipt. All amounts owed that are over 30 days old will accrue interest at 10% per annum. In addition [Plaintiff] will be reimbursed for all out of pocket disbursements including, but not limited to long distance phone calls, postage, photocopying charges, overnight delivery charges and reasonable travel expenses incurred by [Plaintiff] to secure the financing for the facility, not to exceed $10,000 unless otherwise approved by [Defendant] in writing.

(*Id.*) Finally, the preliminary term sheet between the parties labeled the "Transaction Type" as "Senior Secured Debt Financing." (*Id.* at 4.)

---

[4] The March 2009 agreement had also contained an attachment sheet and preliminary term sheet with nearly identical language.

3

Pursuant to the January 2010 agreement, Plaintiff, through its employees William Lockhart and Charles Greenberg, pursued financing for Defendant. (*See* Lockhart Dep. 10, ECF No. 42-1.) Plaintiff maintains that after contacting numerous potential lenders it began discussions with Century Services in July 2010 regarding a new transaction with Defendant. (Compl. ¶¶ 10–11, ECF No. 2.) Notably, the deposition testimony of Asa Elsea, Defendant's Chairman of the Board, reflects that Defendant did not have the financial capability to pay the original Century Services loan when it would have become due in September 2010. (Elsea Dep. 70–71, ECF No. 43-1.)

On August 27, 2010, Century Services and Defendant signed a letter of intent regarding renewal of the loan terms. (Mot. Summ. J. Ex. K, ECF No. 44-12.) The terms of the letter provided renewal of the loan for a three-year term at a reduced interest rate. (*Id.* at 1.) The letter stated that it was "for discussion purposes only, and [was] not intended to constitute a legally binding and enforceable agreement or commitment on the part of either party . . . ." (*Id.* at 2.) Century Services carbon copied Plaintiff on the letter. (*Id.*) Furthermore, Mr. Elsea concedes that Plaintiff "put this deal on the table . . . ." (Elsea Dep. 75, ECF No. 43-2.)

Defendant, however, ultimately decided not to enter into this agreement. Mr. Elsea contends that as the original loan deadline approached he had a number of discussions with Joe Sergio of Century Services. (*Id.* at 78–79.) On September 14, 2010, Joe Sergio emailed Mr. Elsea, copying Mr. Lockhart and Mr. Greenberg, proposing several options to Defendant on behalf of Century Services. (Mot. Summ. J. Ex. D, ECF No. 44-5.) Century Services offered two different "renewal" options including a three year deal under the endorsed terms within the letter of intent. (*Id.* at 1.) Century Services also set forth an "extension fee option" where

4

Defendant would pay a fee of $100,000.00 for a thirty-day extension. (*Id.*)

Defendant ultimately selected the thirty-day option. (Elsea Dep. 82, ECF No. 43-2.) Century Services insisted that this agreement "be called a renewal to capture the existing terms" of the original loan. (*See* Mot. Summ. J. Ex. G, ECF No. 44-8.) Defendant and Century Services ultimately labeled the agreement as an Amendment to the original Loan Agreement. (Mem. Opp'n Ex. A, ECF No. 47-1.) The Amendment emphasized that the terms of the original Loan Agreement remained in effect except as the Amendment specifically revised. (*Id.*) Mr. Elsea states that Defendant was ultimately able to arrange a new loan with another lender independent of the efforts of Plaintiff. (Elsea Dep. 44–45, ECF No. 43-1.) According to Mr. Elsea, this loan closed in October 2010. (*Id.* at 45.)

On November 19, 2010, Plaintiff sent Defendant a bill for the expenses it incurred under the January 2010 agreement totaling $9,126.74. (Mot. Summ. J. Ex. F, ECF No. 44-7.) Defendant refused to pay these expenses. (*See* Elsea Dep. 92, ECF No. 43-2.) The November 2010 bill included charges for airfare, lodging, long distance phone calls, mileage, and professional services.[5] (Mot. Summ. J. Ex. F, ECF No. 44-7.) Mr. Lockhart testified that all of the expenses were incurred by Mr. Greenberg and himself. (Lockhart Dep. 124, ECF No. 42-2.) According to Mr. Lockhart, the professional services were for legal review of documents relating to Defendant. (*See id.* at 124–26.) Mr. Lockhart admitted that Plaintiff did not send weekly invoices of its expenses to Defendant. (Lockhart Dep. 42, ECF No. 42-1.) Lockhart stated, however, that Plaintiff had billed its expenses in the same manner during the previous agreement.

---

[5] Although the evidence reflects that Plaintiff did not request payment until November 2010, the bill also includes a late fee, at a 10% rate, of $149.60. (Mot. Summ. J. Ex. F, ECF No. 44-7.)

5

(*Id.* at 43.) Mr. Greenberg also testified that, under the previous agreement, Defendant paid Plaintiff for expenses at the end of the assignment. (Greenberg Dep. 31, ECF No. 41-1.) In the course of this litigation, Plaintiff has provided some further documentation in support of these expenses.[6] (Mot. Summ. J. Ex. I, ECF No. 44-10.)

Plaintiff now moves for summary judgment.[7] Plaintiff contends that there is no ambiguity within its January 2010 agreement with Defendant and that it is entitled to both the success fee and expenses. Defendant, on the other hand, contends that the language of the January 2010 engagement letter is ambiguous and that disputes of fact exist regarding the parties' intent and Plaintiff's performance. Additionally, Defendant submits the testimony of Paul Bent, an expert in the corporate financing industry, who offers his professional opinion as to various terms and phrases within the January 2010 engagement letter.

## II. Standard

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing

---

[6] With regards to professional services, the invoice Plaintiff provides contains no detail regarding the services the attorney rendered. (Mot. Summ. J. Ex. I at 21, ECF No. 44-10.)

[7] Defendant has not moved for summary judgment.

the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III. Analysis

#### A. Applicable Law

As detailed above, Plaintiff brings a diversity action asserting claims for breach of contract and unjust enrichment. "A court sitting in diversity applies the law of the forum state and, in the absence of direct state court precedent, must make its best prediction as to how the highest state court would resolve the issues presented."[8] *Travelers Prop. Cas. Co. of Am. v. Hillerich &*

---

[8] Similarly, a federal court sitting in diversity applies the choice of law provisions of the forum state. *Pedicini v. Life Ins. Co. of Alabama*, 682 F.3d 522, 526 (6th Cir. 2012). In Ohio "choice of law rules require a court to apply the law of the state with the most significant relationship to the contract." *Konica Minolta Bus. Solutions, U.S.A., Inc. v. Allied Office Prod., Inc.*, 724 F. Supp. 2d 861, 867 (S.D. Ohio 2010). Here, the parties do not dispute, and the Court

7

*Bradsby Co., Inc.*, 598 F.3d 257, 264 (6th Cir. 2010).

Under Ohio law, "the elements for a breach of contract are that a plaintiff must demonstrate by a preponderance of the evidence that (1) a contract existed, (2) the plaintiff fulfilled his obligations, (3) the defendant failed to fulfill his obligations, and (4) damages resulted from this failure." *Anzalaco v. Graber*, 970 N.E.2d 1143, 1148 (Ohio Ct. App. 2012). "The elements of an unjust-enrichment claim are as follows: (1) a benefit conferred by a plaintiff upon a defendant, (2) knowledge by the defendant of the benefit, and (3) retention of the benefit by the defendant under circumstances in which it would be unjust to do so without payment." *Warnecke v. Chaney*, 194 Ohio App. 3d 459, 466 (Ohio Ct. App. 2011).

In interpreting contractual language, the Court's purposes "is to ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361 (Ohio 1997). The Court generally presumes that the intent of the parties resides within the language of the contract. *Id.* "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Id.* On the other hand, "[t]echnical terms will be given their technical meaning, unless a different intention is clearly expressed." *Id.*

"[T]he interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (applying Ohio law). "'Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract.'"

---

agrees, that Ohio law applies to Plaintiff's claims.

8

*Id.* (quoting *City of St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 390 (Ohio 2007)). Nevertheless, "in cases where ambiguity exists, interpretation of the parties' intent is a question to be determined by the trier of fact." *Schafer v. Soderberg & Schafer*, 196 Ohio App. 3d 458, 477 (Ohio Ct. App. 2011) (internal quotations omitted).

"Contractual language is ambiguous only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington v. Lucia*, 151 Ohio App. 3d 409, 414 (Ohio Ct. App. 2003) (internal quotations omitted). "[C]ourts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, i.e., apparent on the face of the contract." *Id.* Moreover, "[i]n determining whether contractual language is ambiguous, the contract must be construed as a whole . . . to give reasonable effect to every provision in the agreement." *Savedoff*, 524 F.3d at 763 (internal quotations and citation omitted).

If "the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning" then extrinsic evidence is admissible "in an effort to give effect to the parties' intentions." *Huff v. FirstEnergy Corp.*, 130 Ohio St. 3d 196, 200 (Ohio 2011) (internal quotations omitted). "Such extrinsic evidence may include (1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement." *Covington*, 151 Ohio App. 3d at 414. Moreover, "[s]uch evidence may include evidence of trade usage within the industry in question." *Maverick Oil & Gas, Inc. v. Barberton City Sch. Dist. Bd. of Educ.*, 171 Ohio App. 3d 605, 613 (Ohio Ct. App. 2007); *see also*

9

*Bottomline Ink, Corp. v. Huntington Bancshares, Inc.*, No. WD-08-003, 2008 WL 2468863, at *2 (Ohio Ct. App. June 20, 2008) ("[P]arol evidence of a general custom or trade usage can be used to show that the parties to a written agreement employed terms having a special meaning within a certain geographic location or a particular trade or industry not reflected on the face of the agreement.") (internal quotations omitted).

**B. Success Fee**

The Court will begin by addressing Plaintiff's breach of contract claim based on Defendant's failure to pay a success fee. First, the Court finds the language of the January 2010 engagement letter ambiguous, at least as it applies to the circumstances of this case.[9] Examining the language of the engagement letter, it is unclear whether facilitating an extension or renewal of a loan with an existing lender—incorporating the same basic terms as the existing loan—actually satisfies the assigned task of arranging senior debt financing. On the one hand, the January 2010 engagement letter uses relatively broad terms to describe Plaintiff's task of arranging senior debt financing, and does not expressly prohibit Plaintiff from brokering a new arrangement with an existing lender. At least some of the language of the contract, however, indicates that an arrangement with an existing and active lender would not satisfy the agreement. After all, the agreement states that it was Plaintiff's obligation to "identif[y] and introduce[]" a financing participant. (Mot. Summ. J. Ex. B at 1, ECF No. 44-2.) In this case, it is undisputed that Defendant had entered into a loan agreement with Century Services prior to its January 2010 agreement with Plaintiff. Moreover, outside of providing a thirty day extension, the September

---

[9] Neither party maintains that the January 2010 engagement letter is too ambiguous to constitute an enforceable contract.

10

2010 agreement between Defendant and Century Services retained the basic terms of the original loan agreement. Under these circumstances, the Court finds that the January 2010 engagement letter is susceptible to different reasonable interpretations as to whether the thirty-day arrangement between Defendant and Century Services satisfies the letters' terms.

Because the language of the contract is ambiguous, extrinsic evidence is admissible and the parties' intent is a question of fact. The parties both emphasize the deposition testimony of their employees as indicative of the parties' intent. In Mr. Elsea's deposition testimony, he defined financing as "the movement of money between a consumer and a lender . . . ." (Elsea Dep. 25, ECF No. 43-1.) Mr. Elsea further testified that a period of financing could be as short as one day. (*Id.* at 26.) Finally, Mr. Elsea defined senior debt financing as "the financing of a large collateral base for a corporation." (*Id.* at 27.) Mr. Lockhart, for his part, defined senior debt financing as "financing that is senior to any equity or subordinated debt." (Lockhart Dep. 28, ECF No. 42-1.) As noted above, in addition to the deposition testimony, Defendant also provides the Affidavit of Mr. Bent. Based on his experience within the corporate financing industry, Mr. Bent avers that the term "senior debt financing" does not include the extension of a previous loan. (Bent Aff. ¶ 9a, ECF No. 47-2.) Additionally, Mr. Bent provides that in the corporate financing industry identifying investors does not mean "identifying parties that are already actively participating in loans to the very borrower who is engaging the arranger . . . ." (*Id.* at ¶ 9c.)

Here, based on both the language of the contract itself and the extrinsic evidence, the Court finds that there is a genuine dispute of material fact concerning the parties' intent. First, the deposition testimony of the parties' employees does little to clarify whether Defendant's ultimate arrangement with Century Services satisfied the January 2010 engagement letter. Although both

11

Mr. Elsea and Mr. Lockhart's definitions of senior debt financing are broad, it is still not clear whether, through the January 2010 agreement, the parties meant to encompass a renewal or extension with an existing lender. Moreover, the parties' definitions of these terms do not negate the implication, from the language of the contract, that Plaintiff was required to introduce or identify a participant in order to be entitled to a success fee. The testimony of Mr. Bent also indicates that the final thirty-day agreement between Defendant and Century Services did not satisfy the terms of the contract.[10] Ultimately, based on the evidence, the Court finds that a reasonable jury could infer that the thirty-day agreement between Century Services and Defendant did not satisfy the parties' intentions in entering the January 2010 engagement letter. Accordingly, summary judgment is inappropriate.

The Court also finds a genuine issue of material fact regarding Plaintiff's performance. Specifically, there is an issue of fact as to whether Plaintiff actually managed and arranged the thirty-day agreement. Plaintiff contends that it was in constant communication with Century Services regarding financing options. Moreover, Mr. Elsea conceded at his deposition that Plaintiff facilitated the three-year loan agreement, with a reduced interest rate, that Century Services offered in August 2010. (*See* Elsea Dep. 75, ECF No. 43-2.) Nevertheless, Mr. Elsea also stated that he was having independent discussions with Century Services regarding numerous options. (*See id.* at 77–79.) Outside of being included on a September 2010 email from Mr.

---

[10] In its Reply, Plaintiff contends that Mr. Bent improperly attempts to add terms to the January 2010 agreement in order to create ambiguity. (Reply 2, ECF No. 48.) As detailed above, however, the Court finds that the January 2010 agreement is ambiguous. Accordingly, Mr. Bent's testimony is admissible to the extent it is helpful in deciphering the parties' intent. Even omitting Mr. Bent's testimony, for the reasons described above, the Court finds a genuine issue of fact as to the parties' intent.

12

Sergio detailing Defendant's options, there is a genuine issue of material fact as to what, if any, role Plaintiff played in brokering the thirty-day agreement between Century Services and Defendant. Although Mr. Elsea indirectly admitted that Plaintiff "[c]ould have" played a role in bringing about this option, this is far from indisputable evidence. Notably, the September 2009 Term Loan and Security Agreement between Defendant and Century Services recognized the possibility of a loan extension, albeit at Century Services discretion. (Mot. Summ. J. Ex. C Sec. 13.1, ECF No. 44-3.) Based on this evidence, the trier of fact could reasonably infer that Plaintiff did not actually arrange and manage the thirty-day agreement between Defendant and Century Services.

The Court also finds summary judgment inappropriate as to Plaintiff's unjust enrichment claim.[11] Plaintiff certainly provided services to Defendant by seeking financing. There is a genuine issue of material fact as to the ultimate benefit Defendant received from these services because, as detailed above, the exact role Plaintiff played in facilitating Defendant and Century Services agreement is in dispute. Even assuming, however, that the initial elements of an unjust enrichment claim are satisfied, there are issues of fact surrounding whether any enrichment was actually unjust. After all, at least under the terms of the January 2010 agreement, Plaintiff did not go completely uncompensated for its services. Rather, it appears that Plaintiff received the minimum fee it was entitled to upon execution of the engagement letter.[12] (*See* Mot. Summ. J. Ex. B at 3, ECF No. 44-2.) Given the terms of the January 2010 agreement, Plaintiff knew that it

---

[11] The parties spend little time independently briefing this claim, although Plaintiff appears to be moving for summary judgment on both claims.

[12] The parties do not address in briefing whether Plaintiff received this fee.

13

was only entitled to a success fee if it ultimately succeeded in obtaining the financing called for within the agreement. Accordingly, whether Defendant was unjustly enriched by Plaintiff's efforts is intertwined with the parties' contractual intent and whether Plaintiff was ultimately successful. For the reasons described above, there are disputes of fact regarding this issue.

## C. Expenses

Plaintiff also seeks summary judgment entitling it to its expenses under the January 2010 agreement. As detailed above, the January 2010 agreement stated that Defendant would reimburse Plaintiff for out of pocket expenses and costs not in excess of $10,000.00. (Mot. Summ. J. Ex. B at 1, ECF No. 44-2.) Plaintiff seeks expenses totaling over $9,000 in airfare, lodging, mileage, long-distance fees, and professional services. (*See* Mot. Summ. J. Ex. 1, ECF No. 44-10.) Plaintiff also seeks late fees at a 10% rate under the terms of the contract.

Defendant first maintains that Plaintiff is not entitled to expenses because it failed to provide invoices as required under the contract. Under the terms of the contract Plaintiff was required to "send invoices weekly . . . ." (Mot. Summ. J. Ex. B at 3, ECF No. 44-2.) Furthermore, Mr. Lockhart admits that Plaintiff failed to provide invoices on a weekly basis. (Lockhart Dep. 42, ECF No. 42-1.) Instead, following the parties past performance under the March 2009 agreement, Mr. Lockhart submitted a bill for its total expenses after the conclusion of its services in November 2010. (*See* Mot. Summ. J. Ex. F, ECF No. 44-7.) Plaintiff asserts that it substantially performed under the contract and that its failure to provide regular invoices does not relieve Defendant of its obligation to pay expenses.

"A breach of a portion of a contract does not discharge the obligations of the parties to the contract unless the breach is material." *Lamar Advantage GP Co., L.L.C. v. Patel*, No.

14

CA2011-10-105, 2012 WL 2988819, at *4 (Ohio Ct. App. July 23, 2012) (internal quotations omitted). "A material breach of contract is a failure to do something that is so fundamental to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform." *Marion Family YMCA v. Hensel*, 178 Ohio App.3d 140, 142–43 (Ohio Ct. App. 2008) (internal quotations omitted). Along similar lines, "a party does not breach a contract when such party has substantially performed the terms of the contract, and mere nominal, trifling or technical departures are not sufficient to constitute breach." *Hansel v. Creative Concrete & Masonry Constr. Co.*, 148 Ohio App. 3d 53, 56 (Ohio Ct. App. 2002). Nevertheless, "[f]or the doctrine of substantial performance to apply, the part unperformed must not destroy the value or purpose of the contract." *Id.*

In this case, at least based on the current evidence, it does not appear that Plaintiff's failure to provide regular invoices resulted in material breach. Although the billing of expenses at the end of services does not meet the technical requirements of the parties' agreement, Plaintiff's omission does not appear to have defeated the essential purposes of the contract or made it impossible for Defendant to pay Plaintiff's expenses. Tellingly, Defendant has not argued that Plaintiff's failure to provide weekly invoices resulted in actual prejudice.[13]

Defendant also disputes the validity of the expenses Plaintiff claims. Mr. Elsea stated, within his deposition testimony, that to his personal knowledge Plaintiff did not fly, accumulate significant mileage, or obtain professional services with regard to the January 2010 agreement. (Elsea Dep. 93, ECF No. 43-2.) The depositions of Mr. Lockhart and Mr. Greenberg reflect that

---

[13] The Court does note some potential inconsistency, however, in Plaintiff's request for late fees. Although Plaintiff apparently chose to wait until November 2010 to bill Defendant for expenses, it appears to calculate late fees before this period. (*See* Mot. Summ. J. Ex. F.)

15

Plaintiff incurred expenses, including airfare and attorney expenses, but both individuals offer limited detail on the subject. (*See* Lockhart Dep. 122–27, ECF No. 42-2; Greenberg Dep. 26–30, ECF No. 41-1.) Furthermore, Plaintiff attached an itemized list of its purported expenses, with invoices, receipts, and billing statements, to its Motion for Summary Judgment. (Mot. Summ. J. Ex. I, ECF No. 44-10.)

A movant for summary judgment has the initial burden of production to demonstrate that there is no genuine issue of material fact. *Blizzard v. Marion Tech. Coll.*, — F.3d —, 2012 WL 5040544, at *2 (6th Cir. 2012). Here, Plaintiff has failed to meet this burden. In particular, Plaintiff has failed to produce sufficient evidence regarding its expenses to eliminate any genuine issue of fact. Once again, the testimony of both Mr. Lockhart and Mr. Greenberg fails to provide extensive detail regarding the expenses Plaintiff incurred in attempting to obtain financing for Defendant. Although Plaintiff submits a list of its expenses, and supporting documentation, this evidence is conclusory, rather than detailed. For example, as noted above, the invoice Plaintiff provides regarding professional services includes no detail about the services the attorney actually provided. (*See* Mot. Summ. J. Ex. I at 44–10, ECF No. 44-10.) Furthermore, Plaintiff has failed to submit any additional evidence, such as an explanatory affidavit, detailing the exact nature of the travel and other expenses on Plaintiff's list.[14] Based on the information before the Court, the records does not support, at this juncture, a finding that there is no genuine issue of material fact as to Defendant's obligation to pay all of the claimed expenses. Under these circumstances, the

---

[14] Plaintiff had not yet produced its itemized expense list at the time of its employees depositions. Accordingly neither Mr. Lockhart nor Mr. Greenberg specifically addressed the evidence within their testimony. (See Lockhart Dep. 122–27, ECF No. 42-2; Greenberg Dep. 26–30, ECF No. 41-1.)

Court cannot conclude that no factual issues remain regarding Plaintiff's purported expenses.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is **DENIED**. (ECF No. 44.)

**IT IS SO ORDERED.**

10-26-2012
**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**